Filed 7/8/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| PACIFIC BELL TELEPHONE COMPANY et al., <br><br>        Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF NAPA et al., <br><br>        Defendants and Respondents. | A170169 <br><br> (Napa County <br> Super. Ct. No. 23CV001211) |

This is an action for refund of property taxes and declaratory relief by Pacific Bell Telephone Company, AT&T Mobility LLC, Sprint Spectrum, L.P., T-Mobile West LLC, and CenturyLink Communications LLC ("the Utilities") against County of Napa (County) and the state Board of Equalization (Board) ("respondents"). The Utilities allege that from 2018 to 2023, the tax rates used to compute the debt-service component of their property taxes, as calculated pursuant to Revenue and Taxation Code section 100,[1] were higher than the rates applied to other property in violation of section 19 of article XIII of the California Constitution ("article XIII, section 19"), which provides that public utility property "shall be subject to taxation to the same extent and in the same manner as other property."

In *County of Santa Clara v. Superior Court* (2023) 87 Cal.App.5th 347 (*Santa Clara*), the Sixth District Court of Appeal held that article XIII,

---

[1]     Further unspecified statutory references are to the Revenue and Taxation Code.

1

section 19 does not mandate that public utility property be taxed at the same rate as other property, and thus, article XIII, section 19 does not render section 100's debt-service rate formula unconstitutional. In light of *Santa Clara*, the parties stipulated to an order sustaining respondents' demurrer to the complaint without leave to amend, and the trial court entered judgment in favor of respondents.

On appeal, the Utilities argue that *Santa Clara* was wrongly decided and ask us to reach a different result. We decline to do so. Based on the language and legislative history of article XIII, section 19, we conclude, like *Santa Clara* and the Fifth District Court of Appeal in *Pacific Bell Telephone Co. v. County of Merced* (2025) 109 Cal.App.5th 844 (*Merced*), that the provision does not contain a requirement that same or "comparable" debt-service tax rates be applied to public utility and nonutility (or common) property and therefore does not render section 100 invalid. Rather, the constitutional phrase "subject to taxation to the same extent and in the same manner as other property" reflects the intent of the voters in adopting article XIII, section 19 to return state-assessed public utility property to the local tax rolls for ad valorem (or value-based) taxation.

We further elect to reach and ultimately reject the Utilities' claim on appeal that section 100's debt-service tax rates violate the principle of taxation uniformity embodied in section 1 of article XIII of the California Constitution ("article XIII, section 1"). Accordingly, we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

The operative complaint alleges as follows. The Utilities are privately held public utilities that own property subject to assessment by the Board. From 2018 to 2023, the average tax rate applied by the County to the Utilities' Board-assessed property exceeded the average rate applied to

2

locally-assessed common property. The Utilities filed claims with the County for refunds of property taxes paid from fiscal years 2018 through 2023, but the County denied the claims. The Utilities then filed suit against the County and the Board under sections 5140 and 5096 for the refund of excessive property taxes paid and for a declaratory judgment that "the tax rate applied by the County to [the Utilities'] state-assessed property in excess of the average property tax rate in the County violates" article XIII, section 19.

The complaint devotes several paragraphs to discussing the decision of the Sixth District in *Santa Clara*. The complaint acknowledges that the trial court is bound by *Santa Clara* but alleges that the Utilities have a good faith basis to believe *Santa Clara* was wrongly decided.

In light of *Santa Clara*, the parties stipulated to an order sustaining respondents' demurrer to the Utilities' complaint.[2] Accordingly, the trial court sustained the demurrer without leave to amend and entered judgment in favor of respondents, leading to this appeal.[3]

---

[2]      Four of the Utilities here were plaintiffs in *Santa Clara* (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 355), and all of the Utilities were plaintiffs in *Merced*, which was decided during the pendency of this appeal (*Merced*, *supra*, 109 Cal.App.5th at p. 851). We requested and received supplemental briefing from the parties addressing the *Merced* decision. Additionally, we note that during the pendency of this appeal, the Third District Court of Appeal issued its opinion in *Pacific Bell Telephone Company et al. v. County of Placer et al.* (2025) 111 Cal.App.5th 634 (*Placer*), affirming the judgment in favor of Placer County on the ground that the public utility plaintiffs there failed to present any basis for defining "comparability" in order to state a valid claim. (*Placer*, at p. 639.)

[3]      We previously granted motions to file amici curiae briefs brought by (1) California State Association of Counties (in support of respondents); (2) California Senior Alliance, National Diversity Coalition, The Two Hundred for Homeownership, Community Repower Movement, RestoreLA-CDC, California Consumer Advocates for Affordability and Safety, and the

3

We review an order sustaining a demurrer de novo, accepting the truth of all properly pled material facts, but not any contentions, deductions, or conclusions of fact or law. (*2710 Sutter Ventures, LLC v. Millis* (2022) 82 Cal.App.5th 842, 850.)

## A. Property Taxation Generally

In California, property is subject to ad valorem or value-based taxation in which a tax rate is applied to a property's assessed value. (§ 2202.) While most property is locally assessed by "the assessing agency of the taxing agency where the property is situated" (§ 404), the property of public utilities is " '[s]tate-assessed' " by the Board (§ 108).

Under the prior system that had "prevailed from 1910 into the 1930's, there was a separation of sources of tax revenue: public utility property was subject to a special gross receipts 'in lieu' tax levied and collected by the state to support state government, and other property was subject to the regular ad valorem property tax levied and collected by local government to support itself." (*ITT World Communications, Inc. v. City and County of San Francisco* (1985) 37 Cal.3d 859, 862 (*ITT*).) There was, however, general

California Black Chamber of Commerce (in support of the Utilities); and (3) California Taxpayers Association, Orange County Taxpayers' Association, California Business Roundtable, The Howard Jarvis Taxpayers Association, California Chamber of Commerce, Los Angeles County Business Federation, California Hispanic Chambers of Commerce, Hispanic Chambers of Commerce of San Francisco, Silicon Valley Leadership Group, and Valley Industry and Commerce Association (also in support of the Utilities).

We decline, however, to consider the paper authored by William G. Hamm, Ph.D., that was submitted by amici California Taxpayer Association, et al. in support of their amicus brief. (See *City of Petaluma v. Cohen* (2015) 238 Cal.App.4th 1430, 1438, fn. 7 [exceptional circumstances or good cause required to take evidence not presented to trial court in review of judgment].)

4

dissatisfaction with this system. "Local tax rates were believed to be too high, in part because public utility property was not on the local tax rolls," while at the same time "state revenues were believed to be too low, in part because public utility tax rolls could be raised only by a two-thirds vote of the Legislature [citation] and the public utilities possessed sufficient political power to block such tax increases." (*Id.* at p. 863.)

In 1933, the voters addressed such dissatisfaction by adopting the Legislature's proposed amendment to the Constitution, known as the Riley-Stewart Plan, which wholly revised this system of taxation. Pursuant to this amendment, "[t]he special gross receipts 'in lieu' tax was repealed and public utility property was subjected to the regular ad valorem property tax, thus restoring public utility values to the local tax rolls and alleviating the local tax burden; the political problems inherent in taxing public utilities at the state level pursuant to legislatively set rates were eliminated by having public utility property centrally assessed by the Board." (*ITT, supra*, 37 Cal.3d at p. 863.) The Riley-Stewart Plan was initially codified as article XIII, section 14 of the California Constitution ("article XIII, former section 14"), but was later renumbered article XIII, section 19 as part of a nonsubstantive reorganization of the California Constitution in 1974. (*ITT*, at pp. 870–871 & fn. 6.)

An important distinguishing feature of public utility property is that the Board may apply "the principle of unit valuation" to assess it. (§ 723.) Under this methodology, the Board values the property of a public utility as a single "going concern" rather than based on its separate assets. (*ITT, supra*, 37 Cal.3d at pp. 864–865.) As our Supreme Court has explained, " 'public utility property cannot be regarded as merely land, buildings, and other assets. Rather, its value depends on the interrelation and operation of the

5

entire utility as a unit. Many of the separate assets would be practically valueless without the rest of the system. Ten miles of telephone wire or one specially designed turbine would have a questionable value, other than as scrap, without the benefit of the rest of the system as a whole.' [Citation.] Unit taxation prevents real but intangible value from escaping assessment and taxation by treating public utility property as a whole, undifferentiated into separate assets (land, buildings, vehicles, etc.) or even separate kinds of assets (realty or personalty)." (*Id*. at p. 863.) "When so valued, those properties are known as 'unitary property.' " (§ 723.)

There are four general stages of unit valuation: "First, the Board annually assesses all unitary property of each public utility, that is, all property that it uses in performing its function. [Citation.] In making this assessment, the Board uses the principle of unit valuation. . . . Second, the owner of the public utility property is offered an opportunity to apply for corrections. [Citations.] Third, the Board transmits to the local taxing authority a roll showing the assessments against public utility property situated within its jurisdiction. [Citations.] . . . . Fourth, the local taxing authority subjects the property so assessed to taxation at the rate fixed in its jurisdiction." (*ITT, supra*, 37 Cal.3d at pp. 864–865.)

In 1978, the voters adopted Proposition 13, which became article XIII A of the California Constitution ("article XIII A") and "impos[ed] important limitations upon the assessment and taxing powers of state and local governments" (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 218), two of which are relevant here. First, under the so-called "valuation rollback" provision, the "full cash value" of real property was set as either the county assessor's valuation of the property as shown on the 1975–1976 tax bill, or, thereafter, its appraised

6

value when purchased, newly constructed, or upon a post-1975 change in ownership. (Art. XIII A, § 2, subd. (a); *ITT, supra,* 37 Cal.3d at p. 862.) Second, Proposition 13 limited the maximum amount of any ad valorem tax on real property to "[o]ne percent (1%) of the full cash value of such property" ("the 1 percent base tax"). (Art. XIII A, § 1, subd. (a).) However, this cap does not apply to "ad valorem taxes or special assessments to pay certain interest and redemption charges" on specified types of bonded indebtedness ("the debt-service component"). (Art. XIII A, § 1, subd. (b).)

The taxation of both state- and locally-assessed properties occurs at the local level, where the county board of supervisors fixes the rate of taxation and levies state, county, and district taxes "as provided by law." (§ 2151.) For locally-assessed property, counties assign the property to a "tax rate area" (TRA)—"a specific geographical area all of which is within the jurisdiction of the same combination of local agencies and school entities for the current fiscal year." (§ 95, subd. (g)(1).) "A county may have hundreds or thousands of TRAs." (*BNSF Railway Co. v. County of Alameda* (9th Cir. 2021) 7 F.4th 874, 880 (*BNSF*).) Article XIII A and section 93 provide the tax rates for locally-assessed property, imposing the 1 percent base tax as well as the debt-service component in an "amount needed as a percentage of property values to produce enough revenue to make payments for the interest and principal on all voter-approved bonded indebtedness issued by any of the various local entities." (*BNSF*, at p. 880, citing art. XIII A and § 93.)

For public utility property, the applicable tax rate is calculated pursuant to section 100. First, section 100, subdivision (a) establishes that each county shall have one "countywide" TRA to which the value of a utility's

7

unitary property in the county is allocated. (§ 100, subd. (a).)[4] Section 100, subdivision (b)(1) then sets forth "effectively a 1% general tax levy" (*BNSF*, *supra*, 7 F.4th at p. 881) akin to the 1 percent base tax, while subdivision (b)(2) sets forth the debt-service component tax rate, which is "calculated as the previous year's unitary debt service rate, [citation], multiplied by the percentage change between the two preceding fiscal years in the county's ad valorem debt service levy (not rate) for the secured roll." (*BNSF*, at pp. 881–882, italics omitted, citing § 100, subd. (b)(2)(A), (B).)

In sum, public utility property and nonutility/common property in California are both subject to ad valorem taxation at the local level, but with key differences. Public utility property is assessed by the Board using the principle of unit valuation. Such property is aggregated into a single countywide TRA rather than assigned to a particular TRA where an individual property is located, and the debt-service tax rate is calculated differently under section 100, subdivision (b) ("section 100(b)"). The controversy here revolves around the section 100(b) formula, which the

---

[4] "Prior to 1986, the value of unitary property was not allocated to the counties—instead, taxpayers reported to individual local TRAs where their property was located. There was no separate tax rate for unitary property; the local taxing jurisdictions applied their own rates. Under this system, an individual assessee had to report in thousands of TRAs." (*BNSF*, *supra*, 7 F.4th at p. 881, fn. 5.) This changed with Assembly Bill No. 2890 (Stats. 1986, ch. 1457), which established that the Board would allocate the assessed value of unitary property to the county level, and that county auditors would allocate the valuation to the various taxing entities using a prescribed formula, irrespective of the location of the utility's property. Assembly Bill No. 454 (Stats. 1987, ch. 921) further simplified the process in order to reduce government costs and the number of tax bills required of each utility. Instead of allocating the assessed value of unitary property on a TRA basis, the assessed value was assigned to a single countywide TRA, with one bill to the utility, and revenue generated from the countywide TRA would be distributed to local jurisdictions according to a statutory formula.

Utilities contend violates article XIII, section 19 when it results in a debt-service tax rate that exceeds the debt-service rate applied to other property.[5]

**B. The *ITT* Decision**

The Utilities first contend the California Supreme Court already resolved this controversy by declaring in ITT that article XIII, section 19 "specifies that public utility property, after it has been placed on the local tax rolls, be levied on at the same rate as locally assessed property." (*ITT*, *supra*, 37 Cal.3d at p. 870.) According to the Utilities, *ITT* is binding precedent that article XIII, section 19 mandates "comparability" of tax rates between utility and nonutility property. We disagree.

In *ITT*, a public utility sued a city, county, and the Board for refusing to adjust the assessment of the utility's property to its 1975–1976 value in accordance with the valuation rollback provision of Proposition 13 (art. XIII A, § 2, subd. (a)). *ITT* held that the valuation rollback provision did not apply to the utility's property because " '[by] its terms, article XIII A applies only to real property taxes' " levied on "*locally* assessed" property, but public utility property is state-assessed and valued under unit taxation, which is not "the taxation of real property or personal property or even a

---

[5]     In their complaint, the Utilities provide a table comparing the "County Average Property Tax Rate(s)" with the Utilities' tax rates in each fiscal year from 2018 to 2022. (Boldface omitted.) Based on this data, the Utilities argue the County levies taxes on utility property at double the average rate applicable to locally-assessed property. Although respondents criticize the Utilities' use of a comparative "average" of countywide tax rates as ambiguous and flawed, for demurrer purposes, we assume the truth of the material allegation that section 100(b) has led to the application of higher debt-service tax rates on public utility property during the relevant time frame.

Though the parties disagree as to whether the complaint asserts a facial or as-applied constitutional challenge to section 100(b), this dispute does not materially affect our analysis.

9

combination of both, but rather . . . the taxation of property *as a going concern*." (*ITT*, *supra*, 37 Cal.3d at pp. 864–866.)

As a secondary argument, the utility argued that even if the valuation rollback provision did not directly apply to the utility's property, "it applies indirectly through the operation of article XIII, section 19" because "by requiring public utility property to be 'subject to taxation to the same extent and in the same manner as other property,' article XIII, section 19, requires public utility property to be *valued* on the same basis as other property, and thereby effectively applies the valuation rollback provision to the unit taxation of public utility property." (*ITT*, *supra*, 37 Cal.3d at pp. 869–870.) *ITT* rejected this argument, explaining that article XIII, section 19 "does not impose a requirement of equal valuation between public utility and other property, but simply specifies that public utility property, after it has been placed on the local tax rolls, be levied on at the same *rate* as locally assessed property, instead of being subject to a special gross receipts 'in lieu' tax. In other words, this comparability requirement was not intended to apply to the *valuation* of public utility property, but only to its *taxation* after assessment." (*ITT*, at p. 870.)

From the above, we see that the controversy in *ITT* involved the valuation of a utility's property, not the rate at which the assessed value was taxed. As such, there was no reason for the *ITT* court to go beyond the valuation issue and interpret whether the phrase "subject to taxation to the same extent and in the same manner" mandates the same tax rate for utility and nonutility property. Because that proposition was not actually considered in *ITT*, the case is not authority for it (see *People v. Baker* (2021) 10 Cal.5th 1044, 1109 (*Baker*)), and the "same *rate*" remark is nonbinding dicta (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1158). The

*Merced* and *Santa Clara* courts have concluded likewise. (See *Merced, supra,* 109 Cal.App.5th at p. 856; *Santa Clara, supra,* 87 Cal.App.5th at pp. 370-371.)

The Utilities insist *Merced* and *Santa Clara* erred in concluding the "same *rate*" remark in *ITT* was dicta because "the Supreme Court's determination that Section 19 encompasses comparability in tax *rate* was a necessary step—indeed, the critical step—in its reasoning." We disagree, as it would have sufficed for *ITT* to explain—as it did in statements bookending the "same *rate*" remark—that section 19 "does not impose a requirement of equal valuation between public utility and other property" because its "comparability requirement" "was not intended to apply to the valuation of public utility property, but only to its taxation after assessment." (*ITT, supra,* 37 Cal.3d at p. 870, italics omitted.)

Nor does the "same *rate*" remark reflect such "compelling logic" that it constitutes persuasive authority on the issue presented here. (*Lacy v. City and County of San Francisco* (2023) 94 Cal.App.5th 238, 248 (*Lacy*).) As will be discussed in part C, *post,* article XIII, section 19 makes no mention of tax rates. And as indicated, the issue of a purported rate equivalency requirement was not presented in *ITT,* and the *ITT* court offered no factual or legal analysis regarding public utility tax rates. Notably, *ITT*'s statement that article XIII, section 19 requires utility property to "be levied on at the same *rate* as locally assessed property" was immediately followed by "instead of being subject to a special gross receipts 'in lieu' tax." (*ITT, supra,* 37 Cal.3d at p. 870.) Thus, the sameness *ITT* was describing was the placement of state-assessed utility property on local tax rolls alongside locally-assessed property, as distinguished from the prior separation of sources system in which public utility property was subject to a special in-lieu tax levied and

11

collected by the state to support state government.  As such, the logic behind *ITT*'s "same *rate*" remark simply does not support the Utilities' rate comparability theory in this case.

Like *Merced* and *Santa Clara*, we reject the Utilities' argument that *ITT* is controlling or persuasive authority on the question before us.

## C. Text and Legislative History

The Utilities contend the text and legislative history of article XIII, section 19 require taxation of public utility property and nonutility/common property at the same or "comparable" rates.  We again disagree.

We begin with "one of the fundamental principles of our constitutional system of government . . . that a statute, once duly enacted, 'is presumed to be constitutional.  Unconstitutionality must be clearly shown, and doubts will be resolved in favor of its validity.' " (*Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055, 1086.)  " '[A] constitutional amendment should be construed in accordance with the natural and ordinary meaning of the words as generally understood at the time of its enactment.' " (*Recorder v. Commission on Judicial Performance* (1999) 72 Cal.App.4th 258, 268 (*Recorder*).)[6]  "[O]ur primary task is to determine the lawmakers' intent. [Citation.]  In the case of a constitutional provision enacted by the voters, their intent governs.  [Citations.]  To determine intent, 'The court turns first to the words themselves for the answer.'  [Citations.]  'If the language is clear and unambiguous there is no need for construction, nor is it necessary to

---

[6]  We accordingly grant the Utilities' request for judicial notice of dictionary definitions of the words "extent" and "manner."  (Webster's New Internat. Dict. (2d ed. 1934), pp. 901, 1497.)  (See *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1334 [" 'When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word.' "].)

resort to indicia of the intent of the Legislature (in the case of a statute) or of the voters (in the case of a provision adopted by the voters).' " (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798.)  In general, we must strive to accord significance to every word, phrase, and sentence in pursuance of the legislative purpose, avoid a construction that makes some words surplusage, and construe the words " 'in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.' " (*People v. Valencia* (2017) 3 Cal.5th 347, 357–358.)

Article XIII, section 19, states in its entirety as follows:

"The Board shall annually assess (1) pipelines, flumes, canals, ditches, and aqueducts lying within 2 or more counties and (2) property, except franchises, owned or used by regulated railway, telegraph, or telephone companies, car companies operating on railways in the State, and companies transmitting or selling gas or electricity.  This property shall be subject to taxation to the same extent and in the same manner as other property.

"No other tax or license charge may be imposed on these companies which differs from that imposed on mercantile, manufacturing, and other business corporations.  This restriction does not release a utility company from payments agreed on or required by law for a special privilege or franchise granted by a government body.

"The Legislature may authorize Board assessment of property owned or used by other public utilities.

"The Board may delegate to a local assessor the duty to assess a property used but not owned by a state assessee on which the taxes are to be paid by a local assessee."

13

The crux of the dispute centers around the second sentence of article XIII, section 19 that utility "property shall be subject to taxation to the same extent and in the same manner as other property." Both the *Santa Clara* and *Merced* decisions concluded this language does not unambiguously mandate same tax rates. In *Santa Clara*, the court remarked that "[w]hile the utilities' proffered construction is a reasonable interpretation of the plain language, the section does not actually say 'at the same rate.' We must assume that the drafters' choice of words 'was not an idle act.' [Citation.] If the voters had intended for article XIII, section 19, to mandate application of the same tax rate, we presume they would have said so." (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 364.)

For its part, the *Merced* court found the text "unambiguous" in *not* imposing a same-rate requirement. (*Merced*, *supra*, 109 Cal.App.5th at p. 862.) Based on its analysis of the language and structure of article XIII, section 19, *Merced* concluded the second sentence was an enabling clause indicating that certain utility property is taxable, not a limiting clause mandating how utility property must be taxed. (*Merced*, at pp. 857–860.)

Both courts found interpretative significance in the third and fourth sentences of article XIII, section 19. The third sentence states the rule that "[n]o other tax" (e.g., nonproperty tax) may be imposed on a public utility "which differs from that imposed on mercantile, manufacturing, and other business corporations," while the fourth sentence provides an exception to this rule for payments a utility company has agreed or is legally required to pay for a special privilege or franchise granted by the government. (Art. XIII, § 19.) As *Santa Clara* observed, "[t]he second sentence does not say, as the third sentence does, that the taxes or rates must not differ. [¶] Similarly, the statement that no '*other* tax or license charge may be imposed on these

14

companies which differs . . .' [citation] further suggests that, by contrast, a property tax imposed on the state-assessed property of those companies may differ. Consistent with this distinction, the second sentence provides that state-assessed property shall be '*subject to taxation* to the same extent and in the same manner.' [Citation.] It does not say that such property '*shall be taxed* to the same extent and in the same manner.' In other words, it describes the condition of such property after the assessment, or valuation, stage, which precedes the separate taxation stage." (*Santa Clara*, *supra*, 87 Cal.App.5th at pp. 365–366.)

*Merced* likewise observed that the third sentence of article XIII, section 19 "expressly limits the types of taxes that may be imposed on utilities," while the fourth sentence provides an exception to this rule that an agreed payment for a special privilege or franchise "is not released merely because it differs from other businesses." (*Merced*, *supra*, 109 Cal.App.5th at p. 858.) "Thus, it is apparent the drafters of Section 19 knew how to draft affirmative limitations restricting the ability to tax utilities when they intended to provide them. The fact that they did not do so in the first paragraph strongly weighs in favor of interpreting the language as an enabling clause, not a limiting clause." (*Merced*, at p. 858.)

*Santa Clara* found additional significance in section 11 of article XIII of the California Constitution. Specifically, *Santa Clara* observed that "[t]he language of section 11, subdivision (f), of article XIII of the California Constitution—part of the same 1974 enactment that made non-substantive revisions to article XIII, section 19—also demonstrates that the drafters recognized the distinction between being 'subject to taxation' and actually being taxed. That section provides that '[a]ny taxable interest of any character, other than a lease for agricultural purposes and an interest of a

15

local government, in any land owned by a local government that is *subject to taxation* pursuant to Section 11(a) of this Article *shall be taxed* in the same manner as other taxable interests.' [Citation.] The two phrases plainly do not mean the same thing in the context of section 11; it follows that 'subject to taxation' in section 19 does not mean 'shall be taxed.' " (*Santa Clara, supra*, 87 Cal.App.5th at pp. 366–367.) *Merced* similarly concluded that the distinction between the phrases "subject to taxation" and "shall be taxed" in article XIII, section 11 "points toward the relevant language" of article XIII, section 19—i.e., "subject to taxation at the same rate and in the same manner as other property"—as "being enabling, not limiting." (*Merced, supra*, 109 Cal.App.5th at pp. 859–860.)

We see no reason to depart from these well-reasoned decisions. The Utilities nevertheless urge that *Santa Clara*'s construction of the second sentence of article XIII, section 19 "invents a twilight stage of the ad valorem property tax system that nobody believes exists and in which nothing of legal consequence occurs—one that lies 'after the assessment . . . stage' but before the 'taxation stage.' " In the Utilities' view, there are only two stages—assessment and taxation. *Merced* squarely rejected this argument, as do we. "There obviously is such a space between assessment and taxation" as section 19 does not impose a tax or require that one be imposed on utility property. (*Merced, supra*, 109 Cal.App.5th at p. 860.) Adding to *Merced*'s point, unit taxation has long been described as proceeding in "four general stages," and that after the assessment and correction stages, the Board transmits the assessment roll to the local taxing authority. (*ITT, supra*, 37 Cal.3d at pp. 863–864.) In the third stage, the now state-assessed property of public utilities is "subject to taxation" by the local taxing authority but has not yet been taxed, an event that occurs in the fourth and final stage.

16

The Utilities also disagree with the conclusion *Santa Clara* draws from the different language used between the second and third sentences of article XIII, section 19. In the Utilities' view, the "far more sensible view" of these sentences is that "they *both* require equal tax rates—but do so using different language because of the features of the type of tax being addressed," that is, tax *rates* are the sole determinant of whether nonproperty taxes burden utility companies more heavily than others, while rates *and* assessment ratios are the critical factors in evaluating the burden of property taxes. Our dissenting colleague makes a similar point. (See dis. opn., *post*, at p. 14 [interpreting "to the same extent" in light of prior use of assessment ratios].) We are not persuaded, as these arguments rely on mere suppositions and fail to give significance to the words and phrases actually used.

The courts in *Merced* and *Santa Clara* also looked to the relevant legislative history (including legislative analyses and ballot materials) and found it reinforces the conclusion that article XIII, section 19 was not intended to mandate same tax rates between public utility and common property.[7] (*Merced, supra*, 109 Cal.App.5th at pp. 862–863; *Santa Clara, supra*, 87 Cal.App.5th at pp. 365–369.) We highlight their main points, which we adopt in full.

---

[7] We grant judicial notice of the following materials as relevant to our legislative history analysis and/or to the general background of the constitutional and statutory provisions discussed in this opinion: exhibits 1, 2, 3, 4, 5, 6, 7, 8, and 11 of the Utilities' request for judicial notice; and exhibits A, B, C, D, E, G, I, J, K, L, M, N, O, P, Q, R, S, T, U, and V of respondents' motion for judicial notice. We otherwise deny the requests for judicial notice as not relevant or necessary to our decision, or not proper subjects of judicial notice. (See *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 31–39.)

*Santa Clara* observed that article XIII, former section 14 stated with regard to other taxes and licenses that "the companies mentioned therein, including the utilities shall be taxed in the same manner and *at the same rates* as the other listed types of business," while providing elsewhere that "state-assessed property of those companies is 'subject to taxation to the same extent and in the same manner.' " (*Santa Clara*, *supra*, 87 Cal.App.5th at pp. 367–368, original italics.) From this, *Santa Clara* persuasively concluded that the drafters must have intended the phrases "at the same rates" and "to same extent and in the same manner" to have different meanings. (*Ibid*.) *Merced* echoed *Santa Clara* on this critical point. (See *Merced*, *supra*, 109 Cal.App.5th at pp. 860–861 ["The fact that former section 14 used the language 'to the same extent and in the same manner' in reference to utility property tax, and the language 'in the same manner and at the same rates' in reference to other taxes on utilities, shows that 'the same extent' does not mean 'at the same rates.' "].)

*Santa Clara* also examined a legislative analysis of article XIII, former section 14 entitled "A Plan for Tax Relief—Senate Constitutional Amendment No. 30, to be Submitted to the Voters for their Approval as Proposition No. 1 on the Ballot at a Special Election on Tuesday, June 27, 1933." (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 368.) Based on this analysis, *Santa Clara* concluded that "the purpose of article XIII, section 19, had nothing to do with mandating equal tax rates, but instead was to 'restor[e] public utility values to the local tax rolls and alleviat[e] the local tax burden.' " (*Santa Clara*, at p. 368.) Thus, *Santa Clara* held that "the language 'to the same extent as' in article XIII, section 19 appears to mean that, after such utility property is assessed by the [Board], it shall be subject to ad valorem taxation at its full market value, rather than via the previous method of gross receipts in-lieu

18

taxation that failed to capture its full value adequately and contributed to the local tax burden.  Similarly, the language 'in the same manner as' appears to mean that, after the utility property is assessed by the [Board], it shall be subject to taxation by the local jurisdictions just as other property is, rather than by the state, as it had been previously." (*Santa Clara*, at p. 369.)

*Merced* reached a similar conclusion based on ballot materials presented to the voters in 1933.  (*Merced*, *supra*, 109 Cal.App.5th at pp. 862–863, 865.)  As *Merced* summarized, "the voters were first told that utility property would be subject to taxation in the same manner as was their common property, which had not been true for more than two decades.  No express mention was made about the rates which would be imposed.  The voters were then told separately that utilities were also to be taxed as business corporations, and that those taxes were required to have equivalent tax rates.  Again, the inclusion of a rate equivalency requirement in one section that was pointedly omitted from the section immediately preceding it is good evidence the voters were not told about, and therefore did not intend to enact, property tax rate protectionism for the utility companies in this ballot measure." (*Merced*, at p. 863.)

The Utilities insist that references to "equalization" in the legislative history signal the intent to mandate rate equivalence.  We disagree, as the tax "equalization" sought through article XIII, section 19 was never characterized as promoting a general principle of tax rate equivalency.  Rather, the specific intent of the measure was to provide tax relief to local taxpayers, in particular, farmers.  As *Merced* observed, "the obvious widespread public opinion was that utilities paid too little in taxes," and thus, "references to 'equalizing' tax rates clearly meant taxing utilities more

19

heavily, not ensuring their tax rates never exceeded those of common taxpayers." (*Merced*, *supra*, 109 Cal.App.5th at p. 866.)

The Utilities further submit that a "Voter Information Guide for 1933 Special Election" informed the electorate that article XIII, section 19 "had 'the purpose of equalizing taxation' by 'tax[ing]' utility property 'as other property.' " But a fuller rendition of this quotation reveals that voters were told the measure would require Board-assessed property of public utility companies to be "taxed locally for local purposes as other property, [while] taxing their franchises and income for State purposes like business corporations." (Italics added.) Thus, the similitude with "other property" that voters were told the measure would achieve was in taxing utility property "locally for local purposes," which, again, goes to the repeal of the separation of sources system, not rate equivalency.

The Utilities insist that no one who voted in favor of article XIII, section 19 in 1933 would have intended to tax utility property at a strikingly higher rate than other property. But the electorate was simply not presented with that question in 1933. Instead, voters were asked to end the separation of sources system by returning state-assessed utility property to local tax rolls in order to alleviate local tax burdens.

We acknowledge that certain legislative history materials of which we have taken judicial notice include references to tax "rates." For instance, the Final Report of the California Tax Commission Submitted to the Governor of California March 5, 1929 stated the Commission's recommendation "[t]hat the operative real estate of all public utilities be valued by the state and then returned to the counties to be added to the local tax rolls and subjected to the same tax rates as are imposed upon the real estate of corporations and individuals." (Italics omitted.) Further, a document entitled "Summary of a

20

Plan for Revision of California's Revenue System to Effect a Reduction in Property Taxes and a Limitation on Governmental Expenditures" summarizes the Riley-Stewart Plan as proposing the "[a]bandonment of the present separation of source and the return of utility property, in part, to the localities where it is located to be subjected to local rates, thereby consolidating all taxpayers into a cohesive group whose interests are identical." We are not convinced, however, that these passing references to tax rates alter the overall picture that emerges from the legislative history.

We also echo the observations of *Merced* that the "Summary of a Plan" document is of questionable relevance given that it "was not drafted by the Legislature, was not intended to be put forth as a piece of legislation, but rather contained ideas the Legislature may or may not wish to put to the voters," and that in fact, it contained proposals that were never even attempted to be implemented, such as a gross receipts tax to be levied on all transactions in the state exceeding $250 per quarter. (*Merced*, *supra*, 109 Cal.App.5th at pp. 864–865.)

In sum, we adopt the analyses and conclusions of the courts in *Merced* and *Santa Clara* that article XIII, section 19's clause "subject to taxation to the same extent and in the same manner as other property" does not mandate equivalent tax rates for utility and nonutility property. (*Merced*, *supra*, 109 Cal.App.5th at p. 862; *Santa Clara*, *supra*, 87 Cal.App.5th at p. 364.)

### D. Contemporaneous Governmental Understanding

In conjunction with their other arguments, the Utilities urge us to consider "an unbroken, decades-long public and governmental understanding" of article XIII, section 19 as requiring comparability in tax rates. The materials proffered by the Utilities do not call for a different

21

result, and *Merced* has already rejected this particular contention as to many of the materials. (*Merced, supra,* 109 Cal.App.5th at p. 864.) We will specifically address some of the materials that might not have been considered in *Merced.*

Generally, " 'past or contemporaneous interpretation by an administrative entity of its constitutional authority, and of a constitutional provision it is charged with implementing, is accorded considerable weight [citation], and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized.' [Citation.] Past or contemporaneous agency interpretation can be particularly useful to resolve 'apparent ambiguities' in a new enactment.' " (*Recorder, supra,* 72 Cal.App.4th at p. 269.) However, "this deference arises (if at all) only when a statute is ambiguous, and is stronger where the agency has adopted a formal regulation interpreting a statute falling within its area of responsibility." (*Siskiyou County Farm Bureau v. Department of Fish & Wildlife* (2015) 237 Cal.App.4th 411, 441.)

Even assuming that the second sentence of article XIII, section 19 might reasonably be viewed as touching on comparability in tax rates, the Utilities do not cite to any formal regulation interpretating the provision in the manner they urge. Nor do they offer any authoritative interpretation of article XIII, section 19 addressing the issue of rate equivalency between utility and nonutility property. Instead, the materials they cite consist mostly of passing remarks by various agencies about tax rates in connection with other matters. We find these materials to be of little, if any, assistance.

For instance, the Utilities quote from the foreword of a 1933–1934 special report to the governor where the Board used the phrase "subjected to like tax rates." In this portion of the report, the Board generally described

22

the repeal of the separation of sources system, stating, "The Constitution now provides that the public utility property heretofore taxed for State purposes on a gross receipts basis shall now be assessed by the [Board] and subjected to the usual ad valorem taxes in the several taxing jurisdictions in which it may be located." The Board then explained the consequent need "for a thorough analysis of local assessment ratios in order that there may be no disparity between the assessments made by the [Board] and those made by local assessors upon property which will appear on the same assessment rolls and be subjected to like tax rates." Rather than interpreting the constitutional amendment to require "like tax rates," the remark came within the context of describing a need to analyze local assessment ratios.

The Utilities also direct us to amici briefs filed by the Board and the Attorney General in *Southern California Tel. Co. v. County of Los Angeles* (1941) 45 Cal.App.2d 111 (*Southern California*). But *Southern California* did not involve a legal dispute about rate equivalency. Rather, it involved a public utility's attempts to invalidate assessments of its property on the ground of constructive fraud. (*Id.* at pp. 113–114.) The main thrust of the amici arguments was that the phrase "subject to taxation to the same extent and in the same manner as other property" did not preclude the Board from using a method of assessing utility property that differed from the methods used by a county assessor to assess nonutility property. Accordingly, the government's references to tax "rates" in these briefs were not authoritative interpretations of article XIII, section 19 on the specific topic of rate equivalency.

The same can be said for the Board's brief in *People v. Tulare County* (1955) 45 Cal.2d 317 and Justice Traynor's dissent in that case. Indeed, like *Southern California*, the dispute in *Tulare* involved property assessments,

23

not tax rates.  There, the Board sought a writ of mandate directing Tulare County to increase the assessed value of all taxable property on its local rolls in compliance with an order of the Board seeking to equalize Tulare County's assessments with the assessments in other counties.  (*Tulare*, at p. 318.) Again, the cherrypicked remarks about "rates" did not stem from a governmental interpretation of article XIII, section 19 regarding tax rate equivalency.  Though we acknowledge the arguments in *Tulare* were based on the premise that the tax rates between utility and nonutility property were the same, that is not tantamount to a legal interpretation of the relevant language of article XIII, section 19.  Instead, it may have reflected recognition of the tax rates applicable at the time.  (See *BNSF*, *supra*, 7 F.4th at p. 881, fn. 5 [noting there was "no separate tax rate for unitary property" prior to 1986].)

In sum, the Utilities' "governmental understanding" argument is not persuasive because it does not advance a formal regulation or authoritative interpretation of article XIII, section 19, and it "quotes selectively from certain documents which have a tangential relation to the interpretive question before us."  (*Merced*, *supra*, 109 Cal.App.5th at p. 864.)

**E. Policy Arguments**

The Utilities and certain amici advance a number of policy arguments to support their proffered interpretation of article XIII, section 19.  They contend there are risks of abuse and undemocratic taxation with regard to utility property because utilities are nonvoting, often nonresident, targets for local taxation.  (See *BNSF*, *supra*, 7 F.4th at p. 879 [noting that railroads are " 'easy prey' " for state and local tax assessors].)  The Utilities further argue that excessive taxation triggers "undemocratic distortions" such as shifting the burden of debt-service taxation onto end-consumers through higher

24

utility bills. Along these same lines, amici curiae California Senior Alliance, et al., argue the imposition of higher tax rates on utility property has the potential to result in increased rates for necessary services such as electricity, gas, and telecommunications.

We are not indifferent to these concerns, but they should be directed to the Legislature, which is best equipped to both weigh their merits and balance them against other competing policy interests that may be implicated. (See *Merced*, *supra*, 109 Cal.App.5th at p. 867 [policy arguments regarding disproportionate taxing of utilities are best addressed to Legislature]; *Santa Clara*, *supra*, 87 Cal.App.5th at p. 371 [same].)

**F. Taxation Uniformity under Article XIII, Section 1**

Finally, the Utilities contend that article XIII, section 19 must be interpreted as carrying forward the " 'golden principle' " of taxation uniformity embodied in article XIII, section 1 in order to achieve harmony between the two provisions. (See 1 Ehrman & Flavin, Taxing Cal. Property (4th ed. 2023) § 1.1.) A similar contention was made and rejected in *Merced*. (See *Merced*, *supra*, 109 Cal.App.5th at pp. 861–862 & fn. 8 [noting the Utilities did not argue or allege that section 100 violates article XIII, section 1 and concluding article XIII, section 1 is not "a significantly helpful interpretative guide in analyzing language of" article XIII, section 19].) It is no more persuasive here.[8]

Critically, the Utilities do not allege section 100(b)'s debt-service rate formula for unitary property violates article XIII, section 1. Though the

---

[8] *Santa Clara* rejected the argument that interpreting article XIII, section 19's phrase "to the same extent" as meaning " 'subject to ad valorem taxation at its full market value' " would be "redundant" to the terms of article XIII, section 1. (*Santa Clara*, *supra*, 87 Cal.App.5th at pp. 369–370.) The Utilities do not renew that argument here.

complaint refers to article XIII, section 1's "Uniformity Clause," it does so only in a paragraph arguing that *Santa Clara* was wrongly decided. On a demurrer however, we appropriately disregard legal contentions and conclusions contained within a pleading. (*Winn v. Pioneer Medical Group* (2016) 63 Cal.4th 148, 152.) The complaint's mere mention of article XIII, section 1's so-called Uniformity Clause provides no basis for establishing a violation of article XIII, section 19.

There remains, however, the question whether article XIII, section 1 might directly invalidate section 100(b)'s rate formula. Although the Utilities did not bring a claim under article XIII, section 1, the issue is a purely legal one that is likely to recur given the Utilities' apparent strategy to litigate the matter across counties and in all appellate districts, and the parties and various amici curiae have briefed the matter. Accordingly, we exercise our discretion to address whether section 100(b) violates article XIII, section 1. (See *Andreini & Co. v. MacCorkle Ins. Service, Inc.* (2013) 219 Cal.App.4th 1396, 1404 [discretion to consider issues not adequately preserved for appellate review that raise pure questions of law and implicate important public policies].)

Article XIII, section 1 provides in its entirety:

"Unless otherwise provided by this Constitution or the laws of the United States:

"(a) All property is taxable and shall be assessed at the same percentage of fair market value. When a value standard other than fair market value is prescribed by this Constitution or by statute authorized by this Constitution, the same percentage shall be applied to determine the assessed value. The value to which the percentage is applied, whether it be

26

the fair market value or not, shall be known for property tax purposes as the full value.

"(b) All property so assessed shall be taxed in proportion to its full value."

*Merced* rejected the Utilities' reliance on article XIII, section 1 by noting that the provision applies only when not "otherwise provided by this Constitution." (*Merced*, *supra* 109 Cal.App.5th at p. 861, citing article XIII, section 1.) From this, *Merced* concluded article XIII, section 1 "provides no guidance as an interpretive aid" because it is merely a "catchall that applies only when other provisions of the Constitutions do not." (*Merced*, at p. 862.) The Utilities criticize the *Merced* court's reasoning, arguing that because article XIII, section 19 says nothing about exempting utility property from taxation (and instead sets forth "a mandate in the opposite direction"), it cannot be said to "provide otherwise" from the bedrock principle of tax uniformity embodied in article XIII, section 1. Assuming without deciding that the Utilities are correct on this point, we conclude, for the reasons that follow, that case law does not support a strict application of tax uniformity under article XIII, section 1 in the present context.

As a preliminary matter, we observe article XIII, section 1 does not use the words "uniform," "uniformity," "taxation uniformity," or "rates." There is, however, general support for the Utilities' contention that article XIII, section 1 expresses a rule of uniformity in how property is burdened by taxation, which includes the application of tax rates. (*McClelland v. Board of Supervisors* (1947) 30 Cal.2d 124, 129 (*McClelland*) [" 'Inequality of taxation is produced as surely by inequality of valuation as by inequality of the rate of tax.' "]; *Gottstein v. Gray* (1944) 66 Cal.App.2d 587, 593 ["The constitutional requirement that property shall be taxed in proportion to its value

27

necessarily applies to the rate of taxation as well as to the matter of valuation."]; see *Dawson v. Los Angeles County* (1940) 15 Cal.2d 77, 80 [" 'tax burden' " is not measured by rate or assessment alone but by " 'the rate times the assessment' "].)

That said, despite the plethora of cited authorities spanning more than a century of precedent, we have not been made aware of a single decision in which a court invalidated a statutory tax rate (or a particular application thereof) as unconstitutional under article XIII, section 1. Nor do the Utilities point us to a case applying the principle of tax uniformity between public utility property and common property.[9] Moreover, as respondents maintain, article XIII, section 1 does not appear to set forth "an ironclad rule" of tax uniformity. Rather, the weight of authority recognizes that article XIII, section 1 leaves room for the Legislature to make reasonable, nonarbitrary classifications of property that impact how such properties are taxed (including the applicable rate).

*Delaney v. Lowery* (1944) 25 Cal.2d 561 (*Delaney*) is instructive. There, a county auditor taxed an oil lease interest as a possessory interest in land at the preceding fiscal year's rate, the rate applicable to unsecured property interests. (*Delaney*, at p. 562.) The taxpayer sought mandamus to compel the auditor to compute the taxes on the oil lease interest using the then-current year's rates for secured property interests, claiming that under section 107, oil lease interests were sufficient security for taxes to be placed on the secured tax roll. (*Delaney*, at pp. 562–564.) The county maintained that such lease interests were possessory interests under article XIII, section 9a of the California Constitution, but the Supreme Court concluded this

---

[9] As discussed (see pt. B of the Discussion, *ante*), *ITT*'s "same *rate*" remark (*ITT*, *supra*, 37 Cal.3d at p. 870) was nonbinding dicta.

28

provision was not a limitation upon the Legislature's ability under section 107 to classify the oil leases as real property interests for purposes of the secured tax roll. (*Delaney*, at p. 564.)

Though *Delaney* did not refer to article XIII, section 1 by name, the court specifically addressed "the contention that lack of uniformity and discrimination will exist if lessee interests are taxed at a rate different from possessory interests, such as the lessee's interest under an ordinary lease for use and occupation." (*Delaney*, *supra*, 25 Cal.2d at p. 572.) Rejecting these arguments, the court explained that oil lease interests "are in a class by themselves and are different from other species of property. The rate fixed is that for the current year, which is the normal situation, and it is primarily a legislative matter to determine whether such interests are not sufficient security for the payment of taxes thereon. Clearly, property may be classified for the purpose of taxation as long as the classification is reasonable." (*Id*. at pp. 572–573.)

The Utilities attempt to distinguish *Delaney* by arguing it merely affirmed the Legislature's authority to determine which constitutionally established tax classification (secured or unsecured) applies to a given type of property. But the upshot of that classification was that it determined the applicable tax rate. As such, *Delaney* supports the view that a reasonable statutory classification of property, even one that results in the imposition of rates that differ from those for other classes, may stand without violating article XIII, section 1.

*Delaney* was cited with approval in *People v. Keith Railway Equipment Co.* (1945) 70 Cal.App.2d 339, 357–358. As *Keith Railway* aptly emphasized, "[e]xact equality is not possible under any system of taxation" (*id*. at p. 351), and "[t]axpayers may be treated differently if they are of different classes and

29

a law sufficiently meets the constitutional requirement if it acts uniformly upon the whole of any single class of individuals or objects, and the classification is founded upon some natural, intrinsic or constitutional distinction" (*id.* at pp. 350–351).

Meanwhile, many of the Utilities' own cited authorities recognize that tax uniformity under article XIII, section 1 generally involves a comparison of similarly-situated properties. For instance, *McClelland*, *supra*, 30 Cal.2d 124, upheld disparate assessments of single- and multiple-family properties. (*Id.* at pp. 128–129.) And *Rancho Santa Margarita v. San Diego County* (1932) 126 Cal.App. 186 (*Rancho Santa Margarita*) reversed an assessment increase because the "method employed [did] not display an attempt to equalize and make uniform the assessed valuations of these lands *with like property similarly situated.*" (*Id.* at p. 201, italics added.)

In making their holdings, both *McClelland* and *Rancho Santa Margarita* relied upon *Birch v. County of Orange* (1921) 186 Cal. 736 for the proposition that article XIII, section 1 entitles the taxpayer to " 'the exercise of good faith and fair consideration on the part of the taxing power in assessing his property, at the same rate and on the same basis of valuation as that applied to other property *of like character and similarly situated.*' " (*McClelland*, *supra*, 30 Cal.2d at pp. 128–129, italics added; *Rancho Santa Margarita*, at p. 197, italics added.) *Birch* involved an action by taxpayers to recover taxes paid under protest, where the assessment of their oil property "exceed[ed] by fifty-five thousand dollars the assessment of the entire 1,123.43 acres of the adjoining oil properties, comprising 617 acres of proven or tested oil lands, and producing monthly 215,608 barrels of oil of like character as against 44,686 barrels from the plaintiffs['] property." (*Birch*, at p. 740.) *Birch* concluded that "the excessive and unreasonable disparity

30

between the assessments upon plaintiffs' lands and others *of like value and similarly situated* is so obvious and inconsistent with any theory of fair dealing that it cannot be reconciled on the mere presumption that the assessor and board of equalization did their duty as they saw it." (*Id.* at p. 741, italics added.) In sum, *McClelland*, *Rancho Santa Margarita*, and *Birch* all acknowledge—either explicitly or implicitly—that the uniformity principle embodied in article XIII, section 1 is not a per se rule of absolute tax equality. They do, however, caution that taxing authorities must make reasonable and nonarbitrary classifications in deciding how and on what basis properties are taxed.

The Utilities' reliance on *Rode v. Siebe* (1898) 119 Cal. 518 fares no better. In upholding a revenue law that required collection of unsecured taxes upon assessment six months before secured taxes were due, *Rode* reinforced the point that classes of taxes may be treated differently without violating the uniformity principle embodied in article XIII, section 1. As *Rode* explained, "there is a difference between secured and unsecured taxes which justifies the classification which the legislature has made, and leaves the law entirely free from objection on the ground that it is not general and uniform." (*Id.* at p. 522.)

The Utilities also quote language from *Shafer v. State Board of Equalization* (1985) 174 Cal.App.3d 423 for the proposition that "[s]ection 1 would be violated if [a] class of property was 'taxed at a rate different from' another class." But *Shafer* was not a tax rate case. It involved a challenge by county tax assessors to section 75.12, which delays assessments on newly constructed property held for sale until the property changes ownership or is rented, leased or otherwise used by the owner. (*Shafer*, at p. 429.) In rejecting the assessors' argument that section 75.12 created a partial

31

temporary "exemption from supplemental taxation" for completed new construction held for sale in violation of article XIII, section 1, the *Shafer* court concluded the supplemental assessment provision merely imposed "a new timing mechanism for valuation and collection." (*Shafer*, at pp. 429–430, italics omitted.) For our purposes, we note that in the portion of *Shafer* quoted by the Utilities, the court explained that "the unsold property held in inventory is not exempt from taxation nor is it taxed at a rate different from other residential real estate" but is "merely deferred until the actual sale," and that upon its sale, "the full cash value of the property is taxed at the same rate as other residential property." (*Id.* at p. 430, italics omitted.) Thus, to the extent that *Shafer* entertained arguments about "rate" uniformity, it did so by comparing the new unsold homes to similar classes of property, e.g., "other residential real property"

The Utilities do not contend it is arbitrary or unreasonable to classify public utility property and nonutility/common property differently in matters of taxation. Indeed, differences abound in how these forms of property are assessed and taxed. (See art. XIII, § 19; § 108 [Board assessment of public utility property]; § 100, subds. (a) [one countywide TRA for unitary property], (b) [debt-service formula for unitary property]; § 723 [unit valuation of unitary property]; *ITT*, *supra*, 37 Cal.3d at pp. 863–865 [discussing rationale for unit valuation of utility property].) Accordingly, and in light of the authorities above, we agree with respondents that the uniformity principle of article XIII, section 1 is not so restrictive that it would require the Legislature to overlook these very real differences between public utility property and common property in setting applicable tax rates. As has historically been the case, the Legislature is given ample breathing room to

implement reasonable and nonarbitrary tax policies and practices that take into account the unique characteristics of public utility property.

We acknowledge that other case authorities cited by the Utilities contain certain remarks that may be perceived as favorable to their position. (See *People v. McCreery* (1868) 34 Cal. 432, 462 [holding that Legislature cannot "discriminate between different classes of property or citizens in the imposition of taxes" in order to exempt certain classes of private property from taxation]; *Lilli Ann Corp. v. City & County of San Francisco* (1977) 70 Cal.App.3d 162, 190 [holding that taxpayers' property "has been subjected to a discriminatory burden because of the general relationship of assessments to market value throughout the city as a whole"]; and *Redman v. Weisenheimer* (1929) 102 Cal.App. 488, 491 ["where the property is not subject to the same rate as other property within the district the tax is not equal and uniform"].) However, these cases are factually distinguishable in the types of properties in question and the actions taken by local taxing authorities to produce the discriminatory results. None involved section 100(b), let alone the assessment or taxation of public utility property.

For these reasons, we conclude article XIII, section 1, either in conjunction with article XIII, section 19, or on its own, does not support the Utilities' theory of mandated taxation uniformity.

### G. Dissent Arguments

Our dissenting colleague takes issue with two of our conclusions regarding *ITT*. First, the dissent argues our evaluation of the sentence containing the "same *rate*" remark "ignores what the *ITT* court itself said about 'the sameness [it] was describing.'" (Dis. opn., *post*, at p. 9.) Clearly that is not the case. Rather, we conclude as an analytical matter that the cited portion of *ITT* does not present "compelling logic" helpful to the Utilities

33

(*Lacy*, *supra*, 94 Cal.App.5th at p. 248) because the language that follows the "same *rate*" remark ("instead of being subject to a special gross receipts 'in lieu' tax") does not conceptually pertain to rates at all.

Second, the dissent rejects our suggestion that *ITT*'s "same *rate*" language was a passing remark, arguing *ITT* naturally had to explain and clarify what article XIII, section 19 requires in order to conclude it does not provide a vehicle for the valuation rollback provision of article XIII A to apply to utility property. (Dis. opn., *post*, at pp. 9–10.) But the dissent does not dispute that rate equivalency under the second sentence of article XIII, section 19 was not the controversy presented to the *ITT* court, let alone analyzed in any depth in the opinion itself. Adhering to the longstanding principle that a case is not authority for a proposition that was not actually considered (*Baker*, *supra*, 10 Cal.5th at p. 1109), we are simply unpersuaded by the undue attention the dissent gives to the single "same rate" reference in *ITT*.

The dissent also disagrees with our textual and legislative history analyses, which largely track the views of the *Santa Clara* and *Merced* courts addressing the same issues before us. (Dis. opn., *post*, at pp. 16–20.) In aiming to give effect to the language and structure of article XIII, section, we are wary of inserting judicial suppositions into areas where the text proves unclear. (See dis. opn., *post*, at p. 14 [interpreting "to the same extent" in light of prior use of assessment ratios].) Rather, we appropriately look to the detailed legislative history of article XIII, section 19 that is available to us. And that historical record demonstrates specifically what the drafters had in mind when they wrote the Riley-Stewart Plan, and what the voters wanted when they approved it: to abolish the separation-of-sources system in order to place public utilities alongside common property taxpayers on the local tax

34

rolls to jointly address local tax burdens.  (See *ITT*, *supra*, 37 Cal.3d at p. 863.)  We fail to see this as a general rate equivalency mandate, for the reasons extensively discussed.  The result is that while the dissent raises thought-provoking questions about whether the current system for calculating the debt-service tax rates on public utility property (the key provisions of which were erected piecemeal in the decades after the Riley-Stewart Plan) requires further amendment, it falls short of demonstrating that a rate-equivalency solution was already built into article XIII, section 19 when first enacted.

Finally, the dissent warns that an unintended consequence of our construction of article XIII, section 19 is that it would permit public utility property to be taxed at a rate much lower than common property, as low as "near zero."  (Dis. opn., *post*, at pp. 18–19.)  Without more, we are not convinced the dissent's hypothetical scenario threatens such an absurd result given that any large reduction in the debt-service tax rate for public utility property would be the direct result of a correspondingly significant percentage decrease in the county's ad valorem debt service levies for the secured roll between the prior two fiscal years.  (See § 100, subd. (b)(2)(B).)

**DISPOSITION**

The judgment is affirmed.  Respondents are entitled to their costs on appeal.

_____
Fujisaki, J.

I CONCUR:

_____
Petrou, J.

35

**TUCHER, P.J., Dissenting.**

The California Constitution declares that property owned by appellant utilities (Utilities) is "subject to taxation to the same extent . . . as other property." (Cal. Const., art. XIII, § 19 (article XIII, section 19).) And yet, the County of Napa (County) taxes utility-owned property at double the rate of other property. The County levies against all real property on its rolls a general tax of 1 percent of assessed value, plus a variable increment sufficient to pay the interest and principal on the bonded indebtedness of the local government entities in the County. (See Cal. Const., art. XIII A, § 1; Rev. & Tax. Code, § 93.)[1] The debt-service component of this tax is calculated differently for utility-owned property (§ 100, subd. (b)), as compared to other property (§ 93, subd. (c)). As a result, utilities in Napa County pay a tax rate for debt service that is 12 times the county average: 1.23 percent of assessed value for utility-owned property and only 0.10 percent for common property.[2] This significant discrepancy causes me to conclude the Utilities have stated a constitutional claim for a partial refund of their property taxes, and the trial court erred in sustaining the demurrer without leave to amend.

---

[1] All unspecified statutory references are to this code. All references to "article XIII" and "article XIII A" are to the California Constitution.

[2] According to data published by respondent State Board of Equalization (Board), the average property tax rate in Napa County for fiscal year 2023–2024 was 1.104 percent <https://boe.ca.gov/dataportal/dataset.htm?url=PropTaxGenPropTaxLevies> [as of Jul. 7, 2025]. Utility-owned property in Napa County was taxed that same year at 2.2347 percent. Subtracting 1.0 from both these numbers, we learn the average debt-service component of Napa County property taxes in fiscal year 2023–2024 was 0.104 percent, while the debt-service component for utility-owned property was 1.2347 percent.

1

## I.

Although there are several differences in the way utility-owned and common property are taxed, only one difference creates the constitutional problem we confront.  Since 1988, counties have set the tax rate for utility-owned property according to a statutory formula that escalates with inflation, while the tax rate for common property does not.  (*Post*, pp. 6–7.)  Before we examine the respective formulas for calculating these rates, a brief historical review provides context.

As the majority explains, California voters in 1933 adopted a constitutional amendment known as the Riley-Stewart plan, which restored public utility property to the local tax rolls so it could be " 'subjected to the regular ad valorem property tax.' "  (Maj. opn. *ante*, at p. 5, quoting *ITT World Communications, Inc. v. City and County of San Francisco* (1985) 37 Cal.3d 859, 863 (*ITT*).)  An ad valorem property tax is one "derived from applying a property tax rate to the assessed value of property."  (§ 2202.)  To begin the process, the Board assesses utility-owned property using a principle called "unit taxation."[3]  (*ITT*, at p. 863.)  The Board then transmits its assessments to local authorities, who assign the property tax rate and levy the tax.  For common property the process begins differently, with a local assessment based on the market value of the real property.  (*Id*. at pp. 862, 864.)

---

[3] Unit (or unitary) taxation relies on "unit valuation" (§ 723) and is based on the principle that " 'public utility property cannot be regarded as merely land, buildings, and other assets.  Rather, its value depends on the interrelation and operation of the entire utility as a unit.' "  (*ITT, supra,* 37 Cal.3d at p. 863.)  The specifics are unimportant in this case because the initial valuation stage is not at issue.

The local assessor's valuation of real property was not, and is not, simply its fair market value, however. When the Riley-Stewart plan was first enacted, local assessors had long been in the habit of valuing common property at less than half its market value. (*County of Sacramento v. Hickman* (1967) 66 Cal.2d 841, 847–849 (*Hickman*).) Standard practice was to determine market value and then reduce this figure by an " 'assessment ratio' "—a percentage that reflected the ratio "of 'assessed value' to market value in the county as a whole." (*Id*. at 848.) By 1967, counties were statutorily required to use an assessment ratio of 20 to 25 percent. (*Id*. at p. 846 [" 'Every assessor *shall* assess' the taxable property in the county at a publicly announced ratio of his own choosing 'which *shall* be between 20 percent and 25 percent of full cash value,' " commanded former § 401].) And by 1972, the assessment ratio was statutorily fixed at 25 percent. (Former § 401, as amended by Stats. 1972, ch. 1135, § 5.)

Because common property in this period was assessed at a fraction of its market value, the same was required for utility-owned property under the Riley-Stewart plan. As the Board's 1933–1934 report explained, with property owned by public utilities being returned to local tax rolls, there was a "need 'for a thorough analysis of local assessment ratios in order that there may be no disparity between the assessments made by the State Board of Equalization and those made by local assessors upon property which will appear on the same assessment rolls and be subjected to like tax rates.' "[4] (*Hickman, supra,* 66 Cal.2d at p. 851.) With an improved understanding of

_____

[4] This Board report "was prepared and signed by Ray L. Riley, the State Controller, and the members of the State Board of Equalization, one of whom was Fred E. Stewart. These two individuals had also been the chief architects and proponents of . . . the entire proposal . . . known as the 'Riley-Stewart Plan.' " (*Hickman, supra,* 66 Cal.2d at p. 851, fn. 7.)

local assessment ratios, the Board would be able to adjust its assessment of utility property appropriately.  In its first regular session held after the constitutional revision, the Legislature gave the Board "the power to equalize its assessments of public utility property within a city with those of other property in the city as determined by the city assessor." (*Id.* at p. 852, citing Stats. 1935, ch. 259.)

Proposition 13 upended this system when the voters approved it in 1978.  (See *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 218, 220.)  The initiative amended the constitution to roll back assessment values on real property to the property's full cash value on the 1975–1976 tax bill.  (*Id.* at p. 257, quoting art. XIII A, § 2.)  Assessments could grow from this base by no more than 2 percent per year, except that property would be reassessed at market value with each change in ownership.  (*Amador Valley*, at p. 257.)  Proposition 13 also required that "[t]he maximum amount of any ad valorem tax on real property shall not exceed one percent" of value, so assessed, except that additional amounts could be levied to service certain bonded indebtedness.  (Art. XIII A, § 1.)  Proposition 13's 1-percent ceiling on rates applied directly to all "real property" (*Amador Valley*, at p. 257), and voters were assured it would apply indirectly to other property as well.  (*ITT, supra,* 37 Cal.3d at pp. 865, 868, & fn. 5.)  With regard to utility-owned property in particular, the Legislative Counsel advised that "state-assessed property would be subject to the same 1-percent limitation as locally-assessed property" because the constitution required that state-assessed property be " 'subject to taxation to the same extent and in the same manner as other property.' "  (Ops. Cal. Legis. Counsel, No. 17388 (Dec. 29, 1977) pp. 41a–42.)  That is, the Legislative Counsel opined that article XIII, section 19's sameness requirement meant

4

counties would have to levy taxes at the 1-percent rate against utility-owned property if Proposition 13 capped rates for common property at 1 percent.

After Proposition 13 limited property tax rates, the Legislature effectively abolished the assessment ratio. Where section 401 had previously required that property be assessed "at 25 percent of its full value," the Legislature amended the statute so that, beginning in 1981, property was assessed at 100 percent of its "full value." (Former § 401, Stats. 1974, ch. 311, § 35, as amended by Stats. 1978, ch. 1207, § 15.) And as the assessment ratio quadrupled the tax rate fell correspondingly, so that tax levies remained stable. Specifically, property tax rates that had been set at 4 percent of assessed value, when assessed value was 25 percent of "full value," fell to 1 percent of assessed value as the assessment ratio vaulted to 100 percent. (§ 93, subd. (b).)

One more change to the property tax system is relevant for this case. About a decade after Proposition 13's passage, the Legislature changed the law on assigning utility-owned property to a tax rate area (TRA). "A TRA is a small geographical area serviced by the same combination of local government entities, including the county, city, special district, and school districts." (*BNSF Railway Co. v. County of Alameda* (9th Cir. 2021) 7 F.4th 874, 880; § 95, subd. (g).) Napa County has dozens of TRA's, and in each TRA the debt-service component of the property tax rate is set at a level that accounts for the bonded indebtedness of all of the various local government entities serving that TRA. Common property is taxed at a rate specific to the TRA where it is physically located. (See § 93, subd. (c).) The same was once true of utility-owned property, but because utilities often own property throughout a county the process proved administratively complex. County authorities were subdividing each utility's assessed property value in the

5

county among multiple TRA's before applying the appropriate tax rate for each TRA. Not only was this process unwieldy, it was also inconsistent with the concept of unit valuation, so the Legislature stepped in with a solution. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 454 (1987–1988 Reg. Sess.) as amended Sept. 1, 1987, p. 3; Assem. Com. on Revenue and Taxation, Analysis of Assem. Bill No. 454 (1987–1988 Reg. Sess.) as amended Mar. 23, 1987, p. 2.) It passed a series of bills beginning in 1986 that created countywide TRA's and assigned all state-assessed property to them. (*Ibid*.) The end result of this legislative activity was section 100, which mandates that each county assign all unitary (and operating nonunitary) property to a countywide TRA. (§ 100, subd. (a).)

Section 100 also establishes the current formula for calculating the tax rate for state-assessed property in a countywide TRA. Simplifying a bit, that formula imposes a property tax rate of 1 percent plus a debt-service component that starts with the previous fiscal year's debt-service component and then adjusts it, based on recent trends. Specifically, the debt-service component of the utilities' property tax rate varies each year according to the percentage change between the two preceding years in "the county's ad valorem debt service levy" for common property. (§ 100, subd. (b)(2)(B).) This means that, with a one-year lag, the debt-service component of the tax *rate* for utility-owned property increases whenever the debt-service component of tax *revenues* from common property increases.

A different formula applies for common property. The debt-service component of the tax rate for common property is set at whatever level is necessary "to produce revenues in . . . the amount needed to make annual payments for" servicing the relevant debt. (§ 93, subd. (c).) This means that if debt service costs are stable and assessed property values increase, the tax

6

rate for common property must decline so that the total amount of tax levied remains the same. And if instead debt service costs rise, but only at the same rate as assessed property values, the tax rate for common property remains unchanged.[5]

Contrast that with the effect of rising property values and debt service expenditures on utility-owned property tax rates. Assume for simplicity's sake that both assessed property values and debt-service costs are steadily increasing at an annual rate of 3 percent. To understand how this inflation affects utility-owned property, we must first look at its effect on common-property tax levies. Although we have seen that a common-property tax *rate* remains constant as property values and debt-service costs rise together, the common-property tax *levy* necessarily increases. The debt-service component of that levy grows by 3 percent annually because the tax base grows at this pace. Under the formula in section 100, this growth in the levy means the debt-service component of property tax rates for utilities will increase by 3 percent per year. (§ 100, subd. (b)(2)(B) [adjusting for percentage change in "the county's ad valorem debt service levy" for common property].) And of course, this 3 percent growth compounds annually.

_____

[5] Adding hypothetical numbers may help illustrate. Suppose the common property in a particular TRA is assessed at a total of $100 million, and servicing the bonded indebtedness of all the local government entities in that TRA requires a total of $1 million annually in tax revenue. The debt-service component of property taxes in that TRA will be set at 1 percent (1/100). Then suppose, over a period of years, assessed property values and debt service costs both double; now the TRA has assessed property values totaling $200 million and requires $2 million annually for debt service. The property tax rate in the TRA will remain unchanged at 1 percent (2/200). But as property values double, tax *levies* will double even as the tax *rate* remains flat.

As a result of economic conditions in Napa County over several decades, the difference in tax rates between utility-owned and common property has now grown to levels that are difficult to ignore. A decade ago, the debt-service component for common property was 0.100 percent, while the equivalent rate for utility property was 0.7839. In the most recent year for which we have data, the debt-service component for common property remains essentially unchanged at 0.104, while the rate for utility-owned property has climbed to 1.2347. This is the 12-fold difference in debt-service components that I noted at the outset and, barring some unforeseen change in the underlying economic trends, it is a difference I would expect to see growing over time.

## II.

Let us turn next to the question of whether the resulting difference in tax rates offends the California Constitution, specifically, the requirement in article XIII, section 19 that utility-owned property be "subject to taxation to the same extent . . . as other property." (Art. XIII, § 19.)

The California Supreme Court has, to some extent, already answered this question, construing this constitutional provision in an extended analysis, with unambiguous language addressing the dispositive point.[6] In *ITT* a unanimous high court announced: article XIII, section 19 "specifies that public utility property, after it has been placed on the local tax rolls," must "be levied on at the same *rate* as locally assessed property." (*ITT, supra,* 37 Cal.3d at p. 870.) "[I]nstead of being subject to a special gross

---

[6] In preparing this dissent, I noticed that the sentence you've just read repeats a word used in the sentence before it. Though the echo was unintentional, I decided not to change "extent" to "degree" or some other synonym because this sentence usefully illustrates that in common parlance "extent" often means degree, measure, or proportion. (See *post,* at p. 12.)

receipts 'in lieu' tax," utility-owned property was to be taxed alongside common property, subject to a "comparability requirement [that] was not intended to apply to the *valuation* of public utility property, but only to its *taxation* after assessment." (*Ibid*.) Italicizing crucial words for emphasis, the Court here makes plain that the tax "*rate*" for utility-owned and common property must be "the same" so that "*taxation* after assessment" is comparable. (*Ibid*.)

The majority asserts this language does not bind us for two reasons, one of which frankly perplexes me. The majority argues that because the *ITT* Court's statement "requir[ing] utility property to 'be levied on at the same *rate* as locally assessed property' was immediately followed by [the phrase] 'instead of being subject to a special gross receipts "in lieu" tax,'" it must be that "the sameness *ITT* was describing was the placement of state-assessed utility property on local tax rolls alongside locally-assessed property, as distinguished from the prior separation of sources system . . . ." (Maj. opn. *ante*, at p. 11.) The problem with this theory is that it ignores what the *ITT* court itself said about "the sameness [it] was describing." (Maj. opn. *ante*, at p. 11.) The *ITT* court does not say, in this portion of the opinion, that utility-owned property should be placed on the "same local tax rolls" as locally-assessed property, nor that the taxes levied against state-assessed and utility-owned property should support the "same local government entities." It says quite explicitly that "the same *rate*" should apply. (*ITT, supra*, 37 Cal.3d at p. 870.) I can only read this language as meaning that what must be "the same" is the tax "*rate*." (*Ibid*.)

As for the majority's other reason, I agree with my colleagues that the question before us was not before the Court in *ITT*, and that the *ITT* Court's interpretation of article XIII, section 19 is not binding on us in this case

9

because this aspect of it was, strictly speaking, dicta. (Maj. opn. *ante*, at pp. 9–10.) But if dicta, this was high-quality, persuasive dicta for three reasons.

First, the statements were not stray remarks, untethered to the Court's analysis. Rather, the *ITT* Court was construing article XIII, section 19 in order to reject appellant's arguments, and in the course of explaining what article XIII, section 19 did *not* do, the Court quite naturally explained what the provision *did* do instead. The question before the Court was "whether the 'valuation rollback' provision of . . . Proposition 13[] applies to unit taxation of public utility property." (*ITT, supra*, 37 Cal.3d at p. 862.) The Court answered this question in the negative, construing article XIII, section 19 *not* to require comparable "*valuation* of public utility property." (*ITT*, at pp. 870–871.) But because " 'subject to taxation to the same extent . . . as other property' " must mean something, the *ITT* Court explained what this language *did* require instead: that property owned by public utilities "be levied on at the same *rate* as locally assessed property," so there would be "comparability" in the "*taxation* after assessment" of utility-owned and other property. (*Id*. at p. 870.)

The second reason I find these statements in *ITT* persuasive is that they are entirely consistent with how the Attorney General, the Board, and several Supreme Court justices had previously construed the same constitutional provision. Shortly after the Riley-Stewart plan was adopted, a utility challenged the alleged over-assessment of its property as a violation of article XIII, section 19's "same extent and . . . same manner" mandate. (Art. XIII, § 19; *Southern Cal. Tel. Co. v. Los Angeles* (1941) 45 Cal.App.2d 111, 114.) A brief filed by the Attorney General and numerous counties explained, "[t]axation of two properties 'to the same extent' as one another

10

implies (1) that each be assessed at the same ratio to full value; and (2) that both be subjected to a tax levy *at a uniform rate*." (Italics added.) Later, when *ITT* was decided, assessment ratios had been statutorily pegged at 100 percent, so the Court understandably ignored the first of these two factors as vestigial. *ITT* adopts the 1938 Attorney General's interpretation of the language of article XIII, section 19, updated for a world where assessment ratios have been equalized.

On two occasions, Roger Traynor—the renowned tax expert and future Chief Justice of California[7]—made a similar argument. In the *Southern California Telephone* case, he filed an amicus brief on behalf of the Board explaining: "[T]he law contemplates that both utility property and common property should bear the *same burden of taxation in proportion to value*," meaning that "the *same tax rate*" should be "applied to all taxable property in the jurisdiction." (Italics added.) Traynor later reprised this theme while on the Court, dissenting from a jurisdictional ruling in *People v. County of Tulare* (1955) 45 Cal.2d 317, 321 (*Tulare*). Joined by two colleagues and reaching the merits, Justice Traynor would have held that the Board had a compelling duty to equalize the valuation of taxable property across counties, in part because "[s]tate assessed property (largely public utility property) and locally assessed property are *taxed at the same rate*. (Art. XIII, § 14.)" (*Id.* at pp. 321, 324 (dis. opn. of Traynor, J.), italics added [citing the predecessor

---

[7] Before his appointment to the bench in 1940, Roger Traynor was "nationally recognized as one of the best tax men in the country," as a result of his academic scholarship and his work with the California State Board of Equalization and the United States Department of the Treasury. (Johnson, History of the Supreme Court, Justices of California: vol. 2, 1900–1950 (1966) pp. 188–189.) He served as counsel for the Board in the 1930's while teaching at Berkeley Law and, in 1933, while on leave from the university for that purpose. (*Ibid.*)

provision to art. XIII, § 19].)  The Board's brief had made the same argument, urging the constitutional necessity of "state-assessed . . . and locally assessed property be[ing] assessed at the same level because they are both *taxed at the same rate*."  (Italics added.)

This is company I like to keep when construing a constitutional tax provision, but there is a third and final reason I would adopt the *ITT* Court's construction of article XIII, section 19.  When I take a close look at the language and legislative history of this provision, it turns out I arrive at the same conclusion as do these decades-old briefs and opinions.  Thus, I would follow the *ITT* Court's construction of article XIII, section 19 not because it is binding on us, but because it is right.

### III.

In construing constitutional text, we start with the words themselves, "giving the words their usual, ordinary meaning."  (*People v. Canty* (2004) 32 Cal.4th 1266, 1276; see also *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798.)  Article XIII, section 19 begins, "[t]he Board shall annually assess" property owned or used by public utility companies.  This first sentence is uncontroversial and unenlightening, except that it sets up article XIII, section 19's all-important second sentence:  "This property shall be subject to taxation to the same extent and in the same manner as other property."  A second paragraph then follows.  It begins, "No other tax or license charge may be imposed on these companies which differs from that imposed on mercantile, manufacturing, and other business corporations."  (Art. XIII, § 19.)  The remainder of article XIII, section 19 includes an exception to this "[n]o other tax" rule, and other provisions even less relevant to the question before us.

The key phrase in article XIII, section 19's second sentence is: "subject to taxation to the same extent." Consulting a contemporaneous dictionary, we find "extent" defined as: "Degree; measure; proportion." (Webster's 2d New Internat. Dict. (1934) p. 901.) Thus, the plain meaning of this constitutional text is that utility-owned property is subject to taxation—meaning it may be taxed—to the same degree, or in the same proportion or measure, as other property is taxed. Today, when assessment ratios are the same for all classes of property, the way to equalize the proportion of taxes paid is to use the same tax rate when levying against utility-owned and common property.

The majority analyzes the language of article XIII, section 19 without providing an alternative construction for the key constitutional phrase. (Maj. opn. *ante*, at pp. 12–15.)[8] Instead, the majority attempts to illuminate the phrase's meaning by negative implication. For example, quoting *Santa*

_____

[8] In its discussion of legislative history, the majority suggests that " 'the language "to the same extent as" in article XIII, section 19 appears to mean that, after such utility property is assessed by the [Board], it shall be subject to ad valorem taxation at its full market value, rather than via the previous method of gross receipts in-lieu taxation that failed to capture its full value adequately . . . .' " (Maj. opn. *ante*, at pp. 17–18, quoting *County of Santa Clara v. Superior Court* (2023) 87 Cal.App.5th 347, 369 (*Santa Clara*).) I'm unclear on whether, " 'at its full market value' " means with an assessment ratio of 100 percent, which would have been much higher than prevailed for common property at the time (see *Hickman*, *supra*, 66 Cal.2d at pp. 847–849), or whether the phrase is meant to refer to the superior ability of unit taxation to capture the full value of utility-owned property in assessing it. (See *ITT*, *supra*, 37 Cal.3d at p. 863.) But I see no reason that the constitutional text should be interpreted to reach assessment ratios and not tax rates, since the two work together to determine the proportion of full value that a taxpayer must pay. And I do not see how the phrase "same extent . . . as" is reasonably construed to refer to the *different* method used for valuing utility-owned, as compared to common, property.

13

*Clara, supra,* 87 Cal.App.5th at page 364, the majority observes that article XIII, section 19 " 'does not actually say "at the same rate," ' " and from this fact concludes, " '[i]f the voters had intended for article XIII, section 19, to mandate application of the same tax rate, we presume they would have said so.' " (Maj. opn. *ante,* at p. 14.)

One problem with this reasoning is that it ignores the role of assessment ratios when the language that became article XIII, section 19 was first adopted. In 1933, the proportion of market value that a property owner had to pay in property taxes was not measured by the applicable tax rate. Instead, tax authorities reduced market value by an " 'assessment ratio' " before applying the tax rate. (*Hickman, supra*, 66 Cal.2d at p. 848.) Thus, in 1933 two classes of property were taxed "to the same extent" only if the *assessment ratio multiplied by the tax rate* was the same for each class. If different assessment ratios were applied to different classes of property, then rates would also have to be different—in the opposite direction—for the overall tax burden to be the same. (See *Tulare, supra*, 45 Cal.2d at p. 321 (dis. opn. of Traynor, J.).) Only when the Legislature equalized assessment ratios statewide did the phrase "to the same extent" come to mean "at the same rate."

Another problem with the majority's reasoning is that it ignores how wondrously rich the English language is. Just because the dispositive sentence of article XIII, section 19 does not use the words "same rate" does not mean the language that was used—"same extent"—must mean something quite different. Sometimes different words convey essentially the same idea. And sometimes they convey a more complex idea, but the complexities don't matter (e.g., "extent" means rate as modified by assessment ratio). For example, if a woman reports spending the afternoon

14

under "cerulean skies," the listener understands the sky was "blue." Nobody would argue the opposite on the basis that, if the woman meant to convey the sky was blue "we presume she would have said so."

Similar efforts to construe the dispositive constitutional phrase by analyzing words it does *not* use recur in the majority's analysis, and I find them equally unpersuasive. Following *Santa Clara*, the majority asserts, " '[t]he second sentence [of article XIII, section 19] does not say, as the third sentence does, that the taxes or rates must not differ. [¶] Similarly, the statement that no "*other* tax or license charge may be imposed on these companies which differs . . ." [citation] further suggests that, by contrast, a property tax imposed on the state-assessed property of those companies may differ.' " (Maj. opn. *ante*, at pp. 14–15.)

In response, I offer these observations about the third sentence in article XIII, section 19. This sentence does not use the word "rates," and it says nothing about property taxes. It is about "other" taxes imposed on utility companies. And the principle this sentence enshrines is the same nondiscrimination idea as in the sentence preceding it, but this time in the context of taxes imposed on the companies themselves, rather than on their property. I do not understand reasoning backwards from the equal treatment principle in the third sentence to an interpretation of the second sentence that allows *un*equal treatment of utility-owned property. The third sentence says taxes on utility companies and other companies may not "differ[]." The second sentence says taxes on their property must be "the same." If there is daylight between the concepts "the same" and "not different," I do not see it.

One final distinction to which the majority attaches significance is between the phrase "subject to taxation," which appears in article XIII, section 19, and the phrase "shall be taxed," which does not. (Maj. opn. *ante*,

at pp. 15–16.) This time, the majority follows both *Santa Clara* and *Pacific Bell Telephone Co. v. County of Merced* (2025) 109 Cal.App.5th 844 (*Merced*) in drawing on language in article XIII, section 11, subdivision (f), all for the purpose of highlighting " 'the distinction between being "subject to taxation" and actually being taxed.' " (Maj. opn. *ante*, at p. 15.) I accept there is a difference between these two concepts. A person "subject to taxation" *may* be taxed; such a person is not necessarily, actually *being* taxed. From this distinction the *Merced* court and the majority conclude that the language of article XIII, section 19 is " 'enabling, not limiting.' " (Maj. opn. *ante*, at p. 16, quoting *Merced*, at pp. 859–860.) But here, their argument loses me. If the language of article XIII, section 19 is enabling, surely we must ask what it enables. For me, the constitutional text answers that question. It enables "taxation [of utility-owned property] to the same extent and in the same manner as other property." (Art. XIII, § 19.) I fail to see how the phrase "subject to taxation" somehow nullifies the equality principle that immediately follows it.

In sum, I conclude the constitutional text is unequivocal. From the words it uses, as well as the context in which they appear, I conclude that article XIII, section 19 allows local taxing authorities to tax utility-owed property "to the same extent," meaning at the same rate, as common property. It does not allow, or enable, taxation at double the rate of common property.

## IV.

Finally, I offer a few thoughts in response to the majority's discussion of the legislative history of article XIII, section 19.

First, the majority and our colleagues in *Santa Clara* and *Merced* analyze some of the legislative history using tools similar to what they bring

16

to bear on the constitutional text.  For example, in analyzing former article XIII, section 14—where the text that became article XIII, section 19 was originally incorporated in a slightly different form—they similarly interpret this text by negative implication.  (Maj. opn. *ante*, at pp. 17–18.)  For the same reasons I reject their reading of the text of article XIII, section 19, I disagree with their interpretation of its predecessor section.  And similarly, I would not read the ballot materials presented to voters in 1933 the way the majority and the *Merced* court do, by emphasizing what they do not say.  (Maj. opn. *ante*, at p. 19.)

Second, the majority follows our sister courts in stressing that the voters' purpose in adopting the Riley-Stewart plan was to provide tax relief to common property owners; voters thought utilities were paying too little, not too much, in property taxes.  (Maj. opn. *ante*, at pp. 19–20.)  The majority goes so far as to discount references in the legislative history to tax "equalization" on the theory that, " 'references to "equalizing" tax rates clearly meant taxing utilities more heavily, not ensuring their tax rates never exceeded those of common taxpayers.' (*Merced*, *supra*, 109 Cal.App.5th at p. 866.)"  (Maj. opn. *ante*, at pp. 19–20.)  Yes, higher taxes on utility-owned property were the intended result of equalizing tax rates in 1933.  But surely "equal" means "equal," no matter whose ox is being gored.  Voters in 1933 chose to end the under-taxation of utility-owned property by equalizing property tax rates.  They "subjected [local utilities] to local rates, thereby consolidating all taxpayers into a cohesive group whose interests are identical."  (California State Board of Equalization: Summary of a Plan for Revision of California's Revenue System to Effect a Reduction in Property Taxes and a Limitation on Governmental Expenditures (1933) at p. 3 (Summary of a Plan).)  This is how Mr. Riley and Mr. Stewart explained their

17

plan to the Legislature in 1933, to guide the Legislature in considering the package of constitutional amendments and legislative bills that would carry the plan into effect.[9] The majority's interpretation of article XIII, section 19 breaks the bonds meant to consolidate the interests of utility- and common-property owners.

Perhaps unintentionally, the majority's construction of article XIII, section 19 would, once again, allow utility-owned property to be taxed at a rate much *lower* than common property. Although the challenge here alleges inequality of the opposite kind, as long as the majority's construction prevails nothing in article XIII, section 19 will stop the Legislature from revising the tax rate on utility-owned property downward—even way down, to near zero.

---

[9] I cannot join the majority or the *Merced* court in discounting "the 'Summary of a Plan' document [a]s of questionable relevance given that it 'was not drafted by the Legislature, was not intended to be put forth as a piece of legislation, but rather contained ideas the Legislature may or may not wish to put to the voters.' " (Maj. opn. *ante*, at p. 21.) The document begins, "The following tax plan has been submitted to the Legislature by State Controller Ray L. Riley and Fred E. Stewart, member of the State Board of Equalization and Director of the Tax Research Bureau. Legislation to carry out the purposes of this plan was introduced prior to the legislative recess. The plan will be considered when the Legislature reconvenes for the second half of the current session." (Summary of a Plan, *supra*, at p. 1.)

The *Merced* court apparently found one proposal in the "Summary of a Plan" that did not make its way into the ballot measure ultimately presented to the voters (*Merced*, *supra*, 109 Cal.App.5th at p. 865), but the proposal that Riley and Stewart described as forming a "cohesive group" with identical interests certainly did. (Summary of a Plan, *supra*, at p. 3.) Under the heading "ALL PROPERTY TO BEAR EQUAL BURDEN," Riley and Stewart write, "We propose to return the real estate and improvements of the utilities to the localities where they are situated, *there to be taxed* by all of the taxing jurisdictions *to the same extent and in the same manner as other like property* in the district." (*Ibid.*, italics added.) This proposal the voters manifestly did adopt.

18

For I see no intellectually coherent way to construe the constitutional phrase "same extent," and to interpret legislative history requiring tax "equalizing," so as to allow a county to tax utility-owned property much more heavily, but not more lightly, than common property.[10] In 1933, in order to provide robust tax relief to the farmers and other owners of common property, the Riley-Stewart plan had to do more than transfer utility-owned property to local rolls. It also had to ensure that, once there, utility-owned property was taxed to the same extent as common property. Otherwise, the transferred property would produce insufficient revenue to provide much relief. (See *ITT*, *supra*, 37 Cal.3d at p. 863 [addressing utilities' "political power to block . . . tax increases" when utility-specific tax rates were legislatively set].) In short, equalizing the tax burden on utility-owned and common property was an integral part of the plan to provide tax relief to farmers.

Finally, I note the difficulty of beating something with nothing. The majority acknowledges that the "Final Report of the California Tax Commission Submitted to the Governor of California March 5, 1929" recommends that utility-owned property " 'be valued by the state and then returned to the counties to be added to the local tax rolls and subjected to the *same tax rates* as are imposed upon the real estate of corporations and individuals.' " (Maj. opn. *ante*, at p. 20, italics added.) Riley and Stewart explained their plan to the Legislature in similar terms in their 1933 Summary of a Plan, and then again in the Board's 1933–1934 report. There,

---

[10] The majority correctly observes that near-zero tax rates for utility-owned property are absurdly unlikely under the current formula in section 100 (Maj. opn. *ante,* at p. 35), but this misses the point that the majority's construction of article XIII, section 19 would allow the Legislature to change that formula to one that produces anemic tax levies from utility-owned property.

19

they urged that, with utility-owned property being "returned to the local tax rolls," it was important to analyze "local assessment ratios in order that there may be no disparity between the assessments made by" state and " 'local assessors upon property which will appear on the same assessment rolls and be *subjected to like tax rates.*' " (*Hickman, supra*, 66 Cal.2d at p. 851, italics added.)  Against this evidence of how those who drafted the constitutional text understood it, the majority cites *no* source that interprets the language as allowing unequal tax rates or tax burdens.  Here, again, the majority is reduced to finding meaning in what was not said.

V.

In *Pacific Bell Telephone Co. v. County of Placer* (2025) 111 Cal.App.5th 634, our colleagues on the Third Appellate District rejected, for a different reason, a tax refund action much like the ones brought here and in *Santa Clara*, and *Merced*.  The *Placer* court concluded the appellant utility companies in that case failed to state a claim because, although they asserted rates for utility-owned and common property must be "comparable," they failed to "present[] any means to determine comparability."  (*Placer*, at p. 644.)  "Their arguments and complaint assume a county's average rate for locally-assessed property should be the baseline," but they offer no authority for requiring that particular baseline and no explanation for what the acceptable bounds for "comparability" might be.  (*Id*. at p. 645.)

The same criticisms might be leveled at the Utilities in this case but do not, in my view, justify affirming dismissal of the Utilities' complaint.  In this case, as in *Placer*, the Utilities contend article XIII, section 19 requires comparability, and yet they do not define the metes and bounds of such comparability.  They offer the countywide average property tax rate as a benchmark, but cite no authority compelling us to choose that measure.  In a

20

different case, such loose ends might threaten to unravel the whole skein. But here, we are at the demurrer stage of a case where the question before the court is *not* precisely how much discrepancy the constitution can tolerate between the tax rate for utility-owned and common property in the TRA's of Napa County. The question is whether the discrepancy that now, in fact, exists is—or is not—constitutionally tolerable.

The Utilities seek a partial tax refund on the ground that section 100 is unconstitutional, as applied to setting recent tax rates for their property in Napa County. We are now familiar with the allegation that the property tax rate the Utilities pay is twice the average rate for common property in the county. But if, instead of comparing the tax rate for utility-owned property to the countywide average, one compares the Utilities' tax rate to the range of tax rates that applies to common property in the various TRA's of Napa County, the result remains concerning. Property tax rates for common property in Napa County ranged in fiscal year 2023–2024 from 1.0192 to 1.2789 percent, depending on a property's location. The tax rate for utility-owned property was almost a full percentage point higher, at 2.2347 percent. This means utility-owned property is being taxed at a rate that is 75 percent higher than the *highest* rate levied against common property anywhere in the county. By any definition of comparability that occurs to me, these two kinds of rates are not comparable,[11] and the County has not even tried to defend them as comparable. It has succeeded so far with an argument that comparability—however defined—is not required.

---

[11] The Utilities' constitutional challenge would look quite different if, for example, the formula in section 100 was subject to a cap of the highest rate charged in any TRA in the county, and subject to a floor of the lowest rate charged anywhere in the county.

I would allow the Utilities' case to go forward, giving all parties an opportunity to elaborate further on what "comparab[le]" tax rates for utility-owned property might require. (*ITT*, *supra*, 37 Cal.3d at p. 870.) I would not, as the majority does here and as my esteemed colleagues have done in *Santa Clara*, *Merced*, and *Placer*, let taxing authorities off the hook at this early stage in the litigation, by construing the phrase "subject to taxation to the same extent" to impose no requirement that the tax rates levied against utility-owned and common property be comparable.

Because I would reverse on the ground that the Utilities have stated a claim under article XIII, section 19, I do not reach the Utilities' alternate argument under article XIII, section 1.

_____
Tucher, P.J.

Trial Court:      Napa County Superior Court

Trial Judge:      Hon. Cynthia P. Smith

Counsel:      Munger, Tolles & Olson, Benjamin J. Horwich, Gabriel M. Bronshteyn, Ginger D. Anders, Andra Lim, Faye Paul Teller; Capitol Law and Policy, and Eric J. Miethke for Plaintiffs and Appellants.

Greenberg Traurig, Colin W. Fraser, Cris K. O'Neall and Bradley R. Marsh for California Taxpayers Association, Orange County Taxpayers' Association, California Business Roundtable, The Howard Jarvis Taxpayers Association and the California Chamber of Commerce as Amici Curiae on behalf of Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, Bradley J. Hamburger, Shannon Mader and Nicholas Whetstone for California Senior Alliance, National Diversity Coalition, The Two Hundred for Homeownership, Community Repower Movement, RestoreLA-CDC, California Consumer Advocates for Affordability and Safety and the California Black Chamber of Commerce as Amici Curiae on behalf of Plaintiffs and Appellants.

Sheryl L. Bratton, County Counsel, and Thomas C. Zeleny, Chief Deputy County Counsel; Colantuono, Highsmith & Whatley, Michael G. Colantuono, Conor W. Harkins and Carmen A. Brock for Defendant and Respondent.

*Pacific Bell v. County of Napa* (A170169)